[ PHILADELPHIA, JANUARY 4TH, 1840. ]

5 Wh  95
27 SC  188

## HACKER and Others *against* PERKINS.

An assignment was made by P. S. & Co. of all their estate and effects, in trust for the payment of creditors, by classes; the provision for the 2d class being in these words, " 2d, to pay and satisfy all and every sum and sums of money borrowed by the said firm, from individuals or firms, and for which either the bond or promissory note of P. S. & Co. has been given, and fully to indemnify and save harmless all and every individual and firm of and from all loss for or by reason of any promissory note, draft or bill of exchange, drawn, endorsed or accepted, or signed by him or them, for the accommodation of the said parties of the first part." The plaintiffs had, about a year before the assignment, sold goods to P. S. & Co., for which the notes of the latter were taken. When these notes become due, P. S. & Co. were in difficulties, and the plaintiffs agreed to renew the notes upon the payment of part. The original notes and many of those given in renewal were deposited by the plaintiffs in bank, and some of both kinds were discounted at bank for the plaintiffs; and some had been transmitted by the plaintiffs to their correspondents, for the price of whose goods sold by the plaintiffs to P. S. & Co. they had been taken. The method pursued by the parties was this:—When a note became due P. S. & Co. took a new note for the amount they wished renewed, adding interest, to the counting house of the plaintiffs, and received from them their check or money for the amount of the new note:—P. S. & Co. then drew the amount of the plaintiffs check out of bank and applied that money towards the taking up of the old notes; they (P. S. & Co.) paying the difference between the notes and the interest, with their own funds. The notes were thus reduced and renewed from time to time. *Held*, that the plaintiffs were not entitled, in respect to these notes, to come in as creditors of the 2d class.

THIS was an action of assumpsit for money had and received, brought by Hacker, Brown & Co. against Perkins, assignee of

(Hacker *v* Perkins.)

Peaslee, Sims & Co. The pleas were non-assumpsit and payment with leave, &c.

The cause was tried at a Court of Nisi Prius held at Philadelphia by GIBSON, C. J. on the 28th of November, 1837, when the following facts appeared in evidence.

On the 24th of November, 1832, Peaslee, Sims & Co. made a general assignment to the defendant, in trust for the payment of creditors, in certain classes, as follows :

1st class, " All borrowed money loaned to the said firm of Peaslee, Sims & Co. and for which neither the bond nor promissory note of the said firm is now held."

2nd class, " All and every sum and sums of money borrowed by the said firm, from individuals or firms, and for which either the bond or promissory note of the said parties of the first part has been given ; and fully to indemnify and save harmless all and every individual and firm, of and from all loss for or by reason of any promissory note, draft or bill of exchange, drawn, endorsed or accepted, or signed by him or them, for the accommodation of the said parties of the first part."

3rd class, " The remaining debts and claims against the said Peaslee, Sims & Co."

By the terms of the assignment, no creditor was to receive any benefit under it, unless on or before the 25th of January, 1833, at noon, he executed to the assignors, a release of all demands.

The plaintiffs were creditors in each of the three classes mentioned in the assignment; and on the 11th of January, 1833, executed the release, and received a dividend of fifty-two and a half cents in the dollar on the amount of their preference in the first class, and gave the following receipt.

" Received, Philadelphia, January 11th, 1833, of S. H. Perkins, assignee of Peaslee, Sims & Co., eight hundred and thirty-eight dollars and eighty-seven cents, being fifty-two and a half cents on the dollar, on amount of our preference under first class.

For the late firm of Hacker, Brown & Co.

$838 87                                        ISAIAH HACKER."

The defendant after paying in full the creditors under the first class amounting to eight thousand six hundred and ninety-eight dollars and ninety cents, and a dividend of ten thousand four hundred and forty-seven dollars and sixty-eight cents, on the undisputed claims in the second class, filed and settled his accounts on the 25th of October, 1833, in the office of the clerk of the Common Pleas of Philadelphia county; which were given in evidence by the plaintiffs on the trial;

(Hacker *v.* Perkins.)

and by which it appeared, that after the allowance of the above payments and of all other credits claimed by him, he had in hand a balance of four thousand seven hundred and fifty-eight dollars seventy-two cents.

The plaintiffs—(besides having other demands partly in the first class and partly in the third class, under the assignment)—were the holders of sixteen promissory notes of the assignors, each drawn in their favour, amounting in the aggregate to eight thousand two hundred and fifty-two dollars eighty-two cents; as to which they claimed to be creditors in the second class under the assignment. Their right, in respect to the amounts of these notes to stand in this class of preferences, was disputed by the defendant on behalf of the other creditors.

The debts due to creditors in the second class, whose claims were undisputed, amounted to thirty-two thousand one hundred and forty nine dollars and three cents; among whom the defendant had paid as above, ten thousand four hundred and forty-seven dollars sixty-eight cents; and he had in hand the balance of four thousand seven hundred and fifty-eight dollars seventy-two cents; making the sum for distribution, according to the account which had been settled when this action was brought, $15,206 40

| | |
|---|---:|
| To the undisputed, | 32,149 03 |
| Adding the amount of the sixteen notes on which the plaintiffs claimed to be entitled to receive a dividend, viz. | 8,252 82 |
| The aggregate would be | $40,401 85 |

and the dividend thereon receivable from fifteen thousand two hundred and six dollars forty cents, would be equal to $37 63 per cent., or three thousand one hundred and five dollars fifty-three cents, the amount to which the plaintiffs considered themselves entitled of the fifteen thousand two hundred and six dollars forty cents, which was for distribution as above on the 25th of October, 1833.

The plaintiffs gave in evidence the above-mentioned assignment and release.

They next gave in evidence the sixteen notes, to which numbers were affixed by the counsel to facilitate reference to them. Of these notes, fourteen were accompanied by the checks of the plaintiffs for their respective amounts, less interest, as explained below in the testimony of Messrs. Burkhart and Peaslee. Each of the notes bore date in the year 1832, and was drawn by Peaslee, Sims & Co., to the order of the plaintiffs. Neither of the sixteen notes had ever been endorsed by the plaintiffs. The following is a schedule of the notes and of the checks.

VOL. v.—13

(Hacker *v.* Perkins.)

1832.

No. 1. Note dated May 21, for $900 payable in 6 mos. (check dated 21 Sep., 1832, for 890 40.)

2. Note dated May 22, for $700 payable in 6 mos. (check dated 22 Sep., 1832, for 692 53.)

3. Note dated Oct 20, for $600 payable in 60 days, (2 checks of date of note one for 500, the other for 93 70.)

4. Note dated Oct. 23, for $850 payable in 60 days, (1 check of date of note for 840 93.)

5. Note dated Oct. 25, for $450 payable in 60 days, (1 check of date of note for 445 20.)

6. Note dated Oct. 27, for $312 05 payable in 60 days, ⎫ one

7. Note dated Oct. 27, for $285 payable in 60 days, ⎬ check

8. Note dated Oct. 27, for $500 payable in 60 days, ⎭ for $1085 35 amount of these three notes, less interest.

9. Note dated Oct. 31, for $500 payable in 60 days, (1 check for 494 67.)

10. Note dated Nov. 3, for $200 payable in 60 days, (1 check for 197 83.)

11. Note dated Nov. 6, for $730 payable in 60 days, (no check.)

12. Note dated Nov. 7, for $200 payable in 60 days, (check for 197 87.)

13. Note dated Nov. 14, for $350 payable in 60 days, (check for 346 27.)

14. Note dated Nov. 15, for $670 payable in 60 days, (no check.)

15. Note dated Nov. 17, for $450 payable in 60 days, (check for 445 20.)

16. Note dated Nov. 20, for $555 77 payable in 60 days, (check for 550.)

The whole amounting to $8252 82

It appeared that the transactions out of which these notes had arisen, were originally sales of goods by the plaintiffs to Peaslee, Sims & Co., for the price of which notes had been given. When the credits for these sales expired, the notes were renewed for a part of their original amount, under an arrangement for an extension of time made between the parties when Peaslee, Sims & Co. were found to be in pecuniary difficulties.

Mr. Burkhart one of the firm of Peaslee, Sims & Co., was called by the plaintiffs, and testified as follows, in respect to the note No. 1.

"Note No. 1, originated in a note dated 13th of October, 1831, for sixteen hundred and forty-five dollars fourteen cents, at eight months, for two bills of merchandise, one of fourteen hundred and ninety-two dollars seventy-three cents, dated 9th month 13th, 1831; and one of the same date for one hundred and fifty-two dollars forty-two cents. The note for sixteen hundred and forty-five dollars

(Hacker v. Perkins.)

fourteen cents, due 13–16 May, endorsed in red ink, May 16, and endorsed by the plaintiffs,—also endorsed paid in the handwriting of A. Comly, book-keeper of Peaslee, Sims & Co.   When that note for sixteen hundred and forty-five dollars fourteen cents became due, it was renewed by paying four hundred and thirty-two dollars fifty-five cents, and a new note for twelve hundred and twelve dollars sixty cents, which I hold in my hand.   We made an arrangement with the plaintiffs to renew for us this note with others; having about that time got into difficulties which they were aware of. Owing them at that time a good deal of money, we thought it advisable that they should renew these notes for us, rather than we should ask others, if we could help it, as it was of importance to them and to us to maintain the credit of our house.   I think we took the twelve hundred and twelve dollars sixty cents, as well as four hundred and thirty-two dollars fifty-five cents, to the bank in which that original note was.   That twelve hundred and twelve dollars sixty cents was taken either in money or in our check. Hacker, Brown & Co. handed us the twelve hundred and twelve dollars sixty cents in money or in their own check; with that we withdrew from bank the note for sixteen hundred and forty-five dollars fourteen cents; when we received their check we first drew it in money; when we drew our own check it was made good through the funds received from Hacker, Brown & Co. and other funds.   The twelve hundred and twelve dollars sixty cents was the renewal of the amount which we could not pay on the former note. It was for the amount that remained unpaid on the first note with the interest added; that amount which remained unpaid on the first note was the same amount for which we received the check or note of the plaintiffs.   (In answer to a juror.)   The most usual way was for them to discount the new note.   It stood in the place of the original note.   It was not intended to pay the original note.   The note for twelve hundred and twelve dollars sixty cents was at four months from the 16th of March.   It is endorsed 'paid.'   When that note for twelve hundred and twelve dollars sixty cents fell due, we reduced it to one thousand dollars by paying two hundred and twelve dollars sixty cents.  I believe the one thousand dollars was received from the plaintiffs in the same way that I have testified in regard to the original note, according to our arrangement.   For the one thousand dollars we gave a new note which I hold in my hand, dated 18th of May, 1832, endorsed paid by the same Allen Comly, our book-keeper.   When that note for one thousand dollars fell due, we paid with our own funds one hundred dollars: the balance, or nine hundred dollars was procured from Hacker, Brown & Co. in the same way, less the discount or interest; and that note for nine hundred dollars, No. 1, was given for it, and this is the check."

On his cross-examination he said—" About the time these renew-

als commenced, we had been unfortunate in making bad debts, and it became necessary that we should have an extension of credit. The plaintiffs were perfectly aware of our situation. They and we thought it advisable for them to renew these notes, that our difficulties might not be known, as we had a prospect of getting through and maintaining our credit; and they agreed to renew these notes in this way that it might not be known. In the mode adopted there was nothing peculiar. It was an extension of credit."

Mr. Peaslee, another of the firm, who was called for the defendant, stated the arrangement with respect to the extension, as follows:

" We, (Peaslee, Sims & Co.,) had it in contemplation at that time to suspend payment, and consulted with Hacker, Brown & Co. on the subject. They advised us not to suspend payments, but to ask for an extension. They offered us an extension, which we agreed to accept, which was, that as fast as our notes to them became due, we should pay as much upon them as we could. I mean the notes to about fifty or sixty thousand dollars, which had been given for merchandise purchased from them. ˙ We did not ask nor obtain an extension from any other creditors. With Hacker, Brown & Co., we pursued that course up to the time of our assignment,—I mean the course of renewals—reducing the amount by the time of assignment to about nine thousand dollars. The notes were renewed by taking to Hacker, Brown & Co. a new note for the amount which we wished renewed, adding interest for the time it had to run, and receiving from Hacker, Brown & Co. a check for a similar amount, independent of the interest, which was added to the note; we then took up the note by paying the difference ourselves. This was the way. At one time, when I was getting a note renewed, Mr. Isaiah Hacker proposed that we should give memorandum checks for the amount of the renewal, instead of a note, to which I dissented, and remarked at the same time, that I should prefer having them arranged in the same manner those had been, which had been previously renewed ; and no objection was made to it on the part of Mr. Hacker. This was some time after the commencement of the renewals. I am not certain of the exact amount of the merchandise for which we owed Hacker, Brown & Co. at the date of the receipts."

Of most of the notes there was more than one renewal. What took place on the occasion of these renewals was alleged by the plaintiffs, and denied by the defendants, to have constituted a borrowing of money. The circumstances attending the renewals were stated by Mr. Burkhart, as follows:

" The money received by us was usually immediately taken to bank where the notes were, and the plaintiffs got it. It was left there

(Hacker v. Perkins.)

and the note given up to us: where we received the money for the purpose of withdrawing the note from bank, or received a check from them, we drew the money, and took that, with what we could pay on account, to the bank, and received the note or notes. There were some of these notes that I believe were settled at the plaintiffs' counting-house. The money was taken to the banks where the plaintiffs kept their account; not where we kept our account. We invariably took the money itself to the bank where the notes were. The new notes were for the balance of the old notes. The present notes are the lowest amounts of the notes. The new notes, with the money received from the plaintiffs, were taken to bank. The day after this took place the plaintiffs stood better than they had stood the day before, in this, that we owed them so much less as the difference between the respective amounts of the old note and the new one. The money was passed to the credit of the plaintiffs. The new note had nothing to do with the bank transaction. I do not know that the bank knew of the notes being renewed. The course is, that the money is passed to the credit of the note in the bank; they are not out of pocket longer than to go from one back to the other. The arrangement between us was that the notes should be renewed. There was no arrangement that they should lend us money. We did occasionally borrow money from the plaintiffs for the purpose of meeting an engagement. We would tell them we were short, and wanted to borrow money for a few days. We have borrowed money and given our notes for the amount; and they at one time advanced us about twelve thousand dollars. They took collateral security notes of others for the amount. They have been paid the collateral securities; and I believe all the borrowed money that we have had of them has been paid.

With regard to a note not in bank we would take the money or our check down to the counting-house, and give a new note for the balance; and on those occasions no money passed between us. No. 14 is a note of that description. When I have said in my examination that the note did not go into bank, the transaction was of this character. The new notes were a mere continuance of the note called the original note. There was nothing but a taking up of the old note for the new one. Such renewals of notes constitute an extension of credit, and is a common transaction in Philadelphia. On such occasions the money always remains with the party who provides it on the occasion. I have never known myself any such transactions, except my own, to be a witness to them."

Mr. Peaslee described the manner of these renewals as follows:

" The notes were renewed by taking to Hacker, Brown & Co. a new note for the amount which we wished renewed, adding interest for the time it had to run, and receiving from Hacker, Brown & Co. a check for a similar amount, independent of the interest which was

(Hacker *v.* Perkins.)

added to the note; we then took up the note, by paying the difference ourselves. This was the way. On these occasions, we, in the first place drew out of the bank the amount of their check and applied that money towards the taking up of the old note; and this, to the best of my knowledge, was repeated on each renewal. The old notes were paid at the bank by us and received by us. The sixteen notes produced by the plaintiffs' counsel purporting to be drawn by Peaslee, Sims & Co. in favour of Hacker, Brown & Co., are all of them genuine notes, with the signatures of Peaslee, Sims & Co., and are all of them, I believe, notes received by the plaintiffs from Peaslee, Sims & Co. in renewal of former notes, in precisely the manner I have stated. As to each of the sixteen notes which I have identified above, I believe that the check of Hacker, Brown & Co. was received, and the amount of it drawn out of bank in money and applied to the taking up of a previous note, as I have explained above. During my interviews with the plaintiffs, nothing was said about borrowing money; they never gave me authority to use the money in any other way than to take up the notes."

The notes in which the notes in question had originated (except one, of which the loss was proved,) and all intermediate notes given in renewal of them, were produced from among the papers of Peaslee, Sims & Co., in the hands of the defendant as assignee; and the witness, Mr. Burkhart, traced each of them successively from the original notes to the present note.

The whole of the several notes referred to, and produced by Mr. Burkhart, were given in evidence; they were all endorsed by the plaintiff, and the word *paid* was written upon the back of them, with the exception of two or three of them, which were cancelled by tearing off the signature; some of them had subsequent endorsements on them.

In the series of renewals there was occasionally a note or two which did not appear to have been in bank, and on the renewal of which no check or money had been given by the plaintiffs to enable Peaslee, Sims & Co. to take it up, as in the cases where the note was in bank. But, except as to notes Nos. 9, 11 and 14 there was no dispute that the original note for the price of the goods and the last note of the series of renewed notes (in each of the two extremes of the series prior to the present notes) had been in bank, and had been at maturity taken out of bank by Peaslee, Sims & Co. with money received by them for the purpose from the plaintiffs, as explained above. As to note No. 9, for five hundred dollars, a check of the plaintiffs was given in evidence and verified for the amount of this note, less the discount. It had originated in a note for fifteen hundred and ninety-six dollars and thirty-two cents, which Mr. Burkhart supposed had not been in bank, but which was afterwards

proved to have been discounted for the plaintiffs in Stephen Girard's bank.

Notes Nos. 11 and 14 were the only two for the amounts of which, less interest, the plaintiffs did not produce their checks as above. Each of them was the renewal of an original note for the price of goods. Mr. Burkhart deposed that the original of note No. 14 never was in bank. He could not remember whether the original of No. 11 had been in bank or not. He did not produce it, but proved its loss. All of the other original notes had been in the bank where those of larger amount had been discounted, and the rest had remained for collection in bank till due.

In the course of the trial the following points of evidence were ruled.

1. Charles S. Peaslee's deposition in writing had been taken on behalf of the defendant at a former period, in which he had deposed in chief, as follows:

" Immediately after our assignment we made out a list of the debts we owed, and of our creditors, in classes according to this schedule, which is the paper itself, marked B. It was laid open for the inspection of all our creditors who chose to come and look at it. It was laid upon our desk at our counting-house, with our assignment and release, where it remained till the time of signing the release expired. Our creditors were in the habit of coming in and examining this schedule with our release and assignment. Hacker, Brown & Co., that is Isaiah Hacker and Mr. Brown were there in our counting-house and examined this schedule with the release and assignment. They did so more than once; our release was signed by them at the same place; we had no communications between the date of our assignment and the time of executing our release with either of that firm, as to the amount in different classes."

And in cross-examination—Being asked whether a conversation did not take place shortly after the assignment was made between himself and Mr. Isaiah Hacker, as to the effect of the assignment; he answered, " I do not recollect. It is possible such a conversation may have occurred, and I cannot say it did not, but I do not remember of any; my mind was very much harrassed at the time."

On a former trial of this cause William T. Burkhart had been examined as a witness for the defendant, and had also testified that soon after the making of the assignment, and before the execution of the release, the assignors prepared the above-mentioned statement of their affairs, to be exhibited to their creditors, and it lay for some time on the desk, in their counting-house, along with the assignment and release, open to the examination of such of their creditors as might wish to inspect them; that the above-named members of the

plaintiffs' firm, were in and out occasionally during this period. He recollected their looking at this exhibit and believed that they, or one of them, examined it. One of them saw it several times; but the witness could not remember any conversation that passed concerning it.

The statement referred to by these witnesses consisted of four schedules, one of them headed thus:

" In order according to our assignment No. 1, borrowed money" in which there were certain names and amounts, and among them " Hacker, Brown & Co. $1597 85."

Another headed " in order according to our assignment No. 2 endorsements," contained among others this item, " to Hacker, Brown & Co. for balance of their bond for money loaned us to pay drafts and acceptances for account of Jones & Truesdell's,

$10376 65

for which they hold Jones and Truesdell's notes as above  6165 54

$4211 11"

Another headed " in order according to our assignment No. 3 for merchandise," contained, among other items " to Hacker, Brown & Co. nine thousand and forty-nine dollars and fifteen cents." The remaining schedule was entitled " summary under head No. 4," and after bringing in the aggregates from each of the three other schedules, proceeded to give a statement of assets in hand and expected; adding " in the above summary we have endeavoured to come as near the actual state of things as in our judgment was correct." It was dated at foot, December 13th, 1832, and was without signature.

The defendant offered to give in evidence, testimony of Mr. Peaslee and Mr. Burkhart, such as they had respectively given before, (as above,) concerning this statement; and in connection with this testimony offered to give in evidence the statement itself.

The Court rejected the offer. The defendant excepted.

2. After Mr. Peaslee, the witness of the defendant, had been examined as to the facts relating to the payment of money by the plaintiffs, at the time of their receiving the notes in question, he was asked by the defendant's counsel, " Did you ever receive, or did they (the plaintiffs) give the money or checks (referred to in the evidence respecting the renewals) as a loan? or did you receive it as agent to take up the notes?" The question was objected to, on the ground, that it involved a mere point of law, viz.: whether a man could receive money for his own use, otherwise than as a borrower. The Court refused to permit the question to be answered.

(Hacker v. Perkins.)

The defendant excepted.

3. The Court also rejected evidence offered on the part of the defendant, to show that according to mercantile usage, the renewal of a note was not considered as a loan of money. The defendant excepted.

The evidence on both sides being closed; under the recommendation of the Court, a verdict was by consent given for the defendant without prejudice to the rights of either party, the Court to have power on the judge's report of the evidence to decide any question of fact, or to order a new trial; if the Court should be of opinion that the verdict ought to have been for the plaintiffs, a verdict and judgment to be entered for the plaintiffs in such sum as the Court might think them entitled to, on the evidence so reported.

Mr. *Cadwalader,* and Mr. *F. W. Hubbell,* for the plaintiffs, argued—

1st. That upon the true construction of the words of the assignment, the plaintiffs were to be considered as creditors for borrowed money; and upon this point they cited *Ellmaker* v. *Ellmaker,* (4 *Watts,* 90.) *Paul* v. *Lewis,* (4 *Watts,* 403.) *Finch,* 321. 5 *Wentworth,* 147, 165. 2 *Richardson's Practice,* 1295. 2 *Chitty's Pl.* 181. *Rastell,* 152. *Marriat* v. *Sister,* (2 *Wilson,* 142.) *Herries* v. *Jameson,* (5 *Term Rep.* 554.) *Jones on Bailments,* 54. *Robson* v. *Bennet,* (2 *Taunton,* 395.) *Hays* v. *M'Clung,* (4 *Watts,* 454.) *Slaymaker* v. *Gundacher,* (10 *Serg. & R.* 82.) *Exparte Barclay,* (7 *Ves.* 597.) *Hart* v. *Boller,* (15 *Serg. & R.* 163.) *Dillon* v. *Rimmer,* (1 *Bingh.* 100; *S. C.* 8 *Eng. Com. Law Rep.* 263.)

2d. That the evidence offered on the trial was properly rejected: in reference to which they cited, *Lyon* v. *Marclay,* (1 *Watts,* 274.) *Gratz* v. *Gratz,* (4 *Rawle,* 431.) *Weidler* v. *The Farmers Bank of Lancaster,* (11 *Serg. & R.* 139.) *Saville* v. *Robinson,* (4 *Term Rep.* 724.) 1 *Star. Evi.* 40. 2 *Id.* 380. *Alexander* v. *Kerr,* (2 *Rawle,* 89.) *Crest* v. *Jack,* (3 *Watts,* 239.) *Fleming* v. *Slocum,* (18 *Johns.* 403.) *Kuhn* v. *Nixon,* (15 *Serg. & R.,* 121.) *Robinson* v. *Justice,* (2 *Penn. Rep.* 19.) *Lewis* v. *Jones,* (4 *Barn. & Cres.* 506, *S. C.* 10 *Eng. Com. Law Rep.* 393.)

Mr. *Perkins,* for the defendants.

1st. The first object must be to discover the intentions and understanding of the parties to this assignment and release: and then whether they have expressed that intention by appropriate terms and descriptions of classes.

The intention of the parties is clear in the first class of preferences under the asignment: there is but one condition annexed to the loan; it must be without evidence of debt, neither bond nor promissory note. In the second class there must be a borrowing of money

Vol. v.—14

and evidence of the debt given; there must be such a borrowing as creates the debt, not an evidence of a prior debt for merchandize; not a delivering to the assignors of money to take to the bank for the plaintiffs' own use, to go directly to their credit; or rather to remain with them. The agreement of the parties as to these sixteen notes, was not that the plaintiffs should lend money; but that they should grant an extension of credit—should renew their notes. But it is argued that the first notes given for the goods were paid; and that the consideration of the new notes, was the money received from the plaintiffs with which to take up the old notes. This was in pursuance of the agreement. The renewal *was* to be in this way, in order to save the credit of the makers; and in law the taking up the old notes, by paying part and giving new notes for the balance was not payment; unless the new note was paid at maturity, or was agreed to be taken in payment. *Putnam* v. *Lewis,* (8 *Johns.* 304.) *House* v. *Low,* (2 *Johns.* 378.) *Tobey* v. *Barber,* (5 *Johns.* 67, 72.) *Johnson* v. *Weed,* (9 *Johns.* 309.) *Owenson* v. *Morse,* (7 *T. R.* 60.) *Drake* v. *Mitchell et al.,* (3 *East,* 251.) *Sheeley* v. *Mandeville, et al.* (6 *Cranch,* 253.) *Shermerhorn* v. *Loines,* (7 *Johns.* 310.) *Wilson* v. *Force,* (6 *Johns.* 110.) *Tapley* v. *Martens,* (8 *T. R.* 451.) *Herring* v. *Singer,* (3 *Johnson's Cases,* 71.) *Tyson* v. *Pollock,* (1 *Penn. Rep.* 381.) *Puckford* v. *Maxwell,* (6 *T. R.* 52.) *Bishop* v. *Row,* (3 *M. & S.* 362.) *Olcott* v. *Rathbone,* (5 *Wend.* 490.) *Porter* v. *Talcott,* (1 *Cowen,* 359.) *Hughes* v. *Wheeler,* (8 *Cowen,* 77.) *Hart* v. *Boller,* ( 15 *Serg. & R.* 163.) *Keen* v. *Dufresne,* (3 *Serg. & R.* 233.) *Ex parte Barkley,* (7 *Ves. Jr.* 597.) *Robinson* v. *Read,* (9 *B. & C.* 449; *S. C.* 17 *Eng. C. Law Rep.* 418.) *Wyatt* v. *Hertford,* (3 *East,* 147.) *Marsh* v. *Pedder,* (4 *Camp.* 257.) *Everett* v. *Collins,* (2 *Camp.* 515.)

The schedules should have been permitted to go to the jury as to what took place at the time of executing the release.— Up to the time of these plaintiffs signing the release, the assignment was merely a proposal, an offer to contract between the parties, not complete till the plaintiffs executed the release; and what then took place is evidence. *Scott* v. *Sherkley,* (3 *Watts,* 50.) *Krider* v. *Lafferty,* (1 *Whart.* 303.) *Ingham* v. *Crary,* (1 *Penn. Rep.* 389.) *Hultz* v. *Wright,* (16 *Serg. & Rawle,* 345.) *Bertsch* v. *Lehigh C. & N. Co.,*(4 *Rawle,* 130.) *Keller* v. *Leib,* (1 *Penn. Rep.* 220.) *Bollinger* v. *Eckert,* (16 *Serg. & R.* 424.) *Miller* v. *Henderson,* (10 *Serg. & Rawle,* 292.) *Christ* v. *Deffenbach,* (1 *Serg. & R.* 464.) 1 *Yeates,* 139. *Cozens* v. *Stevenson,* (5 *Serg. & R.* 421.) *Campbell* v. *McClenachan,* (6 *Serg. & R.* 171.) *Field* v. *Biddle,* (2 *Dall.* 171.) *McMinn* v. *Owen,* (2 *Dall.* 173.) *Zantzinger* v. *Ketch,* (4 *Dall.* 132.) *Dinkle* v. *Marshall,* (3 *Binn.* 587.) Evidence should have been admitted to show that according to mercantile usage, the renewal of a note was not considered . as a loan of money when renewed as the sixteen notes in question were proved to have been.

(Hacker v. Perkins.)

Evidence of usage or custom was admitted to fix the meaning of words in the following cases. *Whipple* v. *Lovitt*, (2 *Mass. Rep.* 89.) *Gordon et al.* v. *Little*, (8 *Serg. & R.* 533.) *Stultz* v. *Dickey*, (5 *Binn.* 285.) 3 *Starkie on Evid.* *Snowden* v. *Warder*, (3 *Rawle*, 101.) *Roscoe on Evid.* 10, and cases there cited. *Jones* v. *Fales*, (4 *Mass.* 245.) *Lincoln* v. *Kennebeck Bank*, (9 *Mass.* 155.) *Blanchard* v. *Hilliard*, (11 *Mass.* 85.) *Pierce* v. *Butler*, (14 *Mass.* 303.) *Whitnell* v. *Johnson*, (17 *Mass.* 449.) 13 *Peters's S. C. Reports*, 89. *Clayton* v. *Gregson*, (30 *Eng. Com. Law Rep.* 400; *S. C.* 4 *N. & M.* 602; *S. C.* 31 *Eng. Com. Law Rep.* 342; *S. C.* 5 *A. & E.* 302.) *Loring* v. *Gordon*, (5 *Pickering*, 15.) *Birch* v. *Depeyster*, (2 *Eng. Com. Law Rep.* 359.) *Cutter* v. *Powell*, (6 *T. R.* 320.) 2 *Bingh. N. C.* 668; 29 *Eng. Com. Law Rep.* 452. 15 *Wend.* 561. 2 *M. & R.* 85. 2 *Shepley*, 185. 20 *Pickering*, 150.

Mr. *J. R. Ingersoll*, on the same side, cited *Page* v. *The Bank of Alexandria*, (7 *Wheaton*, 35.) *Mandeville* v. *Welsh*, (5 *Wheaton*, 277.) *Musgrave* v. *Gibbs*, (1 *Dall.* 237.) *Galagher* v. *Roberts*, (2 *Wash. C. C. Rep.* 191.) *Brown* v. *Jenkins*, (2 *Wash. C. C. Reps.* 24.) *Commercial Bank* v. *Clapier*, (3 *Rawle*, 338.) *Moliere* v. *The Penn. Ins. Co.*, (5 *Rawle*, 347.) *M'Culloh* v. *Girard*, (4 *Wash. C. C. Rep.* 289.) *Cortelyou* v. *Lansing*, (2 *Caines*, 202.) *Armine* v. *Spencer*, (4 *Wendell*, 407.) *Jackson* v. *Parkhurst*, (4 *Wendell*, 369.) *Brewster* v. *Countryman*, (12 *Wendell*, 446.) *Parker* v. *Hook*, (16 *Serg. & Rawle*, 327.) *Halsey* v. *Whitney*, (4 *Mason*, 206.) *Gordon* v. *Cooley*, (1 *Sumner*, 527.)

Mr. *F. W. Hubbell*, replied.

The opinion of the Court was delivered by

Huston, J.—On the 24th of September, 1832, Charles S. Peaslee, John C. Sims, and William F. Burkhart made an assignment for the benefit of their creditors, to Mr. Perkins, the defendant, in trust to pay—

" Class 1. All borrowed money loaned to the said firm of Peaslee, Sims & Co., and for which neither the bond or note of the said firm is now held.

Class 2. All and every the sum and sums of money borrowed by the said firm from individuals or firms, for which either the bond or promissory note of the said parties of the first part have been given, and fully to indemnify and save harmless all and every individual and firm of and from all loss for or by reason of any promissory note, draft, or bill of exchange, drawn, endorsed, or accepted, or signed by him or them for the accommodation of the parties of the first part" (the parties of the first part were Peaslee, Sims & Co.)

Class 3. The remaining debts and claims against Peaslee, Sims & Co.

In April, 1832, Peaslee, Sims & Co. had sold goods to Jones & Truesdell, of Wheeling, to about twelve thousand dollars, advanced about five thousand dollars, and were liable on acceptances to about twenty-four thousand dollars. The house at Wheeling having stopped, Peaslee, Sims & Co. felt themselves under great difficulties, and proposed to assign. The father of William Burkhart, and Hacker, Brown & Co., proposed each to advance them twelve thousand dollars; and as they were largely indebted to Hacker, Brown & Co., for goods sold these, the latter proposed to give them an extension of credit. The amount of goods sold was from fifty to sixty thousand dollars, for all of which they held the notes of Peaslee, Sims & Co., payable at different times. William Burkhart and Charles S. Peaslee were both examined, and stated what was agreed on and what was done under the agreement. The difference between their accounts of the matter is only verbal, in substance they agree. This testimony was as follows:

" The plaintiffs were perfectly aware of our situation. They and we thought it advisable for them to renew these notes, that our difficulties might not be known, as we had a prospect of getting through and maintaining our credit; and they agreed to renew these notes in this way that it might not be known. In the mode adopted there is nothing peculiar. It was an extension of credit. The notes were renewed by taking to Hacker, Brown & Co., a new note for the amount we wished renewed; we paid on a note falling due as much as we could; the new note and interest was for the balance and was given to them, and they gave us a check for the amount of such new note. The check was taken to the bank where Hacker, Brown & Co. kept their money, and we drew the amount and with that and what we could pay, lifted the old note. The money was taken to the bank where the plaintiffs kept their account, and not where we kept our account; we invariably took the money itself to the bank where the notes were. The new notes are for the balance of the old notes; the present notes are the lowest amount of notes; the day after this took place, the plaintiffs stood better than they stood before, in this, that we owed them so much less as the difference between the respective amounts of the old and new notes. The money was passed to the credit of the plaintiffs; the new note had nothing to do with the bank transaction. I do not know that the bank knew of the notes being renewed. The course is that the money is passed to the credit of the note in bank. They were not out of pocket longer than to go from one bank to the other. The arrangement between us was that the notes should be renewed. There was no arrangement that they should lend us money." Again, the witness says; " There were some of these notes that I believe were settled at the plaintiffs' counting-house;" and as to these, it seems conceded, the plaintiffs have no claim to come in as for money lent. The allegation is, that in the mode which was adopted

(Hacker v. Perkins.)

expressly that it might not be known what was going on, Hacker, Brown & Co. gave to Peaslee, Sims & Co. money or a check to receive money and carry it to bank and pay it in for the use of Hacker, Brown & Co., and this they wish to call, and wish the Court to say, is money lent by them, and borrowed by Peaslee, Sims & Co. Where a man borrows money, it is his own, and he may use it for a purpose before arranged in his own mind, or for some other purpose. When money or a check to receive money is to be carried to a particular bank, and paid in to the credit of the man who handed the money, or gave the check, there is no lending money or borrowing money in the case—it is merely placing confidence in the man that he will do with the money or check what was intended by him who intrusted him; if he does any thing else with it he is guilty of a fraud, or, under some circumstances of preconceived intention to violate trust, and use the money, may be guilty of larceny.

Generally it is, as between creditor and debtor, immaterial whether a note was given for money lent, or for goods sold. But in case of assignment, it has become usual to direct payment of the fund, so as to prefer debts contracted in one mode from those contracted in another mode: and in the case before us three different grades are marked.

We had some learning and notice of the terms in old declarations and pleas; and not a few cases, in some of which the new note was an extinguishment of the old note; and in some it was held not to extinguish the present debt or note. The result of all the cases in our own Court, and perhaps in all, is, that it depends on the intention of the parties; and if that intention can be ascertained, it decides whether it is or is not the extinction of the old, or creating a new debt. Such is the decision in *Slaymaker* v. *Gundaker's Ex'rs*, (10 *Serg. & Rawle,* 82;) and in 15 *Serg. & Rawle,* 183, the very point came up, and though it is stated by the late chief justice, that " a new note, without any new consideration, given by the same parties, will generally be considered as the same debt, yet it is error to decide it as a point of law; that whether it is a continuance of the old, or creating a new, must be left to the jury." In this case, the partners, Peaslee and Burkhart, were examined, one by the plaintiffs, and one by the defendant; and there is no discrepance. We have thus positive proof that the offer of Hacker, Brown & Co. was to extend the time of payment on the notes for goods sold, that there was never at any time any mention of a loan on the one side, or borrowing on the other, so far as respected these notes, or the renewal of them. That the understanding was, that the money or checks were given to Peaslee, Sims & Co., as a mode of extending the credit; and it was part of the understanding, that this was not to be known.

Hacker, Brown & Co. understood perfectly the difference between a debt for goods sold, and one for money lent. About the time of

(Hacker *v.* Perkins.)

this arrangement they drew up a judgment bond, and presented it for signature to Peaslee, Sims & Co., who executed it, and Hacker, Brown & Co. gave a receipt, stating the receipt of the said bond as security for the repayment of twelve thousand three hundred and thirty-seven dollars and twenty-nine cents, " which we have agreed to loan them ; and for the payment of two notes we have lent them ; one for three thousand four hundred and ninety-two dollars and twenty-eight cents, due the 23d of this month, and one for eight thousand two hundred and ninety-eight dollars and fifteen cents, due on the 17th of 7th month next ; if Peaslee, Sims & Co. pay the above sums, with interest, the above bond and judgment are to be given up :" thus showing a clear distinction, understood by themselves, between a debt for money, or notes loaned, and a debt for goods sold. Their debt for goods sold amounted, then, to fifty or sixty thousand dollars ; and in consequence of this arrangement was in six months reduced to about nine thousand dollars. The assignees, Peaslee, Sims & Co., also well understood and correctly expressed themselves. " 1st class, all borrowed money loaned to us, for which no bond or note was given, or is held ; 2nd, all sums borrowed by us for which a note or bond is held ; and to save harmless, &c., every drawer, or endorser or acceptor of a note, draft or bill for our accommodation ; 3, all other debts and claims against us." Now from this it appears that each party understood the terms borrow and lend ; and each used them about the same time in the instruments which each drew up ; and used them in the same sense ; and each seemed to think that in case of inability to pay all, a distinction ought to be made. There was then no mistake as to these terms ; and it would be misspent time and labour to define what every body understands. The proposal by Hacker, Brown & Co., and agreed to and accepted by Peaslee, Sims & Co., was, that the former should grant an extension of time of payment, on the notes for goods sold ; but as these notes, or some of them, were in bank, either discounted, or placed there for collection, they must be renewed or paid when due, or a protest and stoppage of Peaslee, Sims & Co., would ensue. This would be contrary to the wishes and to the interest of both parties, or of the creditor party, at least ; for they were to receive at the renewal of each note as much as Peaslee, Sims & Co. could pay ; and did receive it. Where the note was not in bank, the debtors paid as much as they could, and gave a new note for the balance ; and this is not denied to be an extension of credit. Now the only difference between these cases and those where the notes were in bank, arose from that part of the agreement which provided that what was doing between these parties should not be known ; and what was done, in the form in which it was done, was calculated to effect that purpose. If Hacker, Brown & Co. had themselves gone to the bank and withdrawn the note due, and on receiving on it what the others could pay, can-

(Hacker v. Perkins.)

celled or given up the old note, and taken a new note for what was unpaid, there could have been no allegation that they loaned, or that the others borrowed; but this might have injured the credit of Peaslee, Sims & Co, and might have prevented their going on. To keep up appearances, the plan of intrusting them to carry a check for the amount of the new note to one bank, and receive the money and pay it into another bank to the credit of Hacker, Brown & Co., was adopted; but the money thus received at one bank, and carried to another, never was the money of Peaslee, Sims & Co. for one moment—was never agreed or understood by either party to be so; it was as much the property of Hacker, Brown & Co. while in the hands of Mr. Peaslee in carrying it from one bank to another, as it was after he paid it into bank, as agreed and directed. Peaslee had more power over it while in his own hands than after he paid it into bank, but he had no more right to it before he paid it in than after. There was then no lending of money by the one party, or borrowing by the other in the renewal of these notes; and the plaintiffs cannot sustain their claim. I never much liked the practice, which I believe is peculiar to this city, of leaving facts and law to be decided by the Court. I have always believed, and still believe a jury more competent to find facts, and draw inferences from facts, than the Court, because they understand the common business and common contracts in life better, at all events than I do; and unless where the matter was to come before other judges than me, or other judges with me, I would never take up a case in that way. But where all the testimony is the same, and proves the same contract, and the same object in view of each party to the contract, there can be little difficulty; for a jury must believe it, except it proves something impossible, or for some reason incredible. Here the proof is full and clear that the agreement was to extend the credit to Peaslee, Sims & Co. on the notes for goods sold: that the arrangement was not to be known to the other creditors: that nothing was at any time said about lending by the one, or borrowing by the other: that by the agreement of the parties the extension of credit was to be given by the debtors paying as each note fell due as much as they could, and giving a new note for the balance; and that the checks or money given, to lift the note then due was no loan, but simply intrusting one of the debtor firm to receive money at one bank, and instantly pay it into another bank to the credit of the creditor firm, which drew the check. This dispute is not between Hacker, Brown & Co. and Peaslee, Sims & Co., but between the former and the other creditors. The assignee thought he could not pay these notes for goods sold as in the second class; and the plaintiffs insisted it was money lent by them: we believe it was not: and that the agreement and intention of the parties precludes us from so considering it.

Much was said on the effect of giving up the old note when part

(Hacker *v.* Perkins.)

was paid and a new one given for the balance. It may be a circumstance in weighing a doubtful case. A bank sometimes extends credit by accepting a new note for the whole or part of one due. The books show whether the new note was a renewal of the old note or a new loan by the bank. But in a case where it was an extension of credit on a note in bank, and it was not intended that the bank should know that it was not paid in full, by cash; and the bank did not know that the new note was for part of the old debt, it was most prudent to take home the old note when part paid, and a new one given for the balance: and if such was the agreement, and this was done in pursuance of the agreement, and the proof is full to that effect, it leaves nothing to conjecture or presumption.

Judgment for the defendant.